UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

HERNANDO P.,[1]

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

Case No.:  20cv875-MSB

**ORDER REVERSING DECISION OF COMMISSIONER AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS**

**[ECF NO. 11]**

On May 11, 2020, Hernando P. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Defendant") denying Plaintiff's application for a period of disability and disability insurance benefits.  (ECF No. 1; Certified Admin. R., ECF No. 8 ("AR") at 13–31.)  Now pending before the Court is the parties' Joint Motion for Judicial Review.  (See J. Mot. Judicial Review, ECF No. 11 ("J. Mot.").)  For the reasons set forth below, the Court **ORDERS** that judgment be entered reversing the decision of the Commissioner and

---

[1]  Under Civil Local Rule 7.1(e)(6)(b), "[o]pinions by the Court in [Social Security cases under 42 U.S.C. § 405(g)] will refer to any non-government parties by using only their first name and last initial."

1  remanding this matter for further administrative proceedings pursuant to sentence four

2  of 42 U.S.C. § 405(g).

3  ## I.  PROCEDURAL BACKGROUND

4          On November 29, 2016, Plaintiff filed an application for a period of disability and

5  disability insurance benefits under Title II of the Social Security Act, alleging disability

6  beginning May 31, 2015.  (AR at 385–87.)  After his application was denied initially and

7  upon reconsideration, (id. at 315-20, 322–27), Plaintiff requested an administrative

8  hearing before an administrative law judge ("ALJ"), (id. at 328–29).  An administrative

9  hearing was held on October 16, 2018.  (Id. at 227–86.)  Plaintiff appeared at the hearing

10  with counsel, and testimony was taken from him and a vocational expert ("VE").  (Id.)

11         As reflected in his February 25, 2019 hearing decision, the ALJ found that Plaintiff

12  had not been under a disability, as defined in the Social Security Act, from May 31, 2015

13  through the date of the decision.  (Id. at 16–27.)  The ALJ's decision became the final

14  decision of the Commissioner on March 27, 2020, when the Appeals Council denied

15  Plaintiff's request for review.  (Id. at 1–6.)  This timely civil action followed.

16  ## II.  SUMMARY OF THE ALJ'S FINDINGS

17         In rendering his decision, the ALJ followed the Commissioner's five-step

18  sequential evaluation process.  See 20 C.F.R. § 404.1520.  At step one, the ALJ found

19  that Plaintiff had not engaged in substantial gainful activity since May 31, 2015, the

20  alleged onset date.  (AR at 18.)  At step two, the ALJ found that Plaintiff had the

21  following severe impairments:  degenerative disc disease of the lumbar spine, status-

22  post remote laminectomy; cervical stenosis; and degenerative joint disease of the right

23  knee, status-post right knee arthroscopy.  (Id.)  At step three, the ALJ found that Plaintiff

24  did not have an impairment or combination of impairments that met or medically

25  equaled the severity of one of the impairments listed in the Commissioner's Listing of

26  Impairments.  (Id. at 19.)

27         Next, the ALJ determined that Plaintiff had the residual functional capacity

28  ("RFC") to do the following:

perform sedentary work as defined in 20 CFR 404.1567(a) in that the claimant can lift and/or carry 10 pounds frequently and less than 10 pounds frequently; the claimant can sit for 6 hours in an 8-hour workday with normal breaks; and the claimant can stand and/or walk for 2 hours in an 8-hour workday with normal breaks, subject, however, to these additional restrictions:  the claimant can occasionally climb stairs and ramps, but can never climb ladders, ropes and scaffolds; the claimant can occasionally balance, stoop, kneel, and crouch, but rarely crawl; the claimant is limited to frequent reaching overhead bilaterally; the claimant needs to avoid work requiring constant neck flexion or extension; the claimant needs to avoid work requiring more than frequent pushing or pulling with the lower extremities; and the claimant must avoid concentrated exposure to extreme cold or vibration.

(Id. at 20.)

At step four, the ALJ found that Plaintiff was not able to perform any of his past relevant work.  (Id. at 25.)  The ALJ then proceeded to step five of the sequential evaluation process.  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy, such as travel clerk, office manager, and air transportation dispatcher, the ALJ found that Plaintiff was not disabled.  (Id. at 26–27.)

### III.  DISPUTED ISSUES

As reflected in the parties' Joint Motion for Judicial Review, Plaintiff is raising the following issues as the grounds for reversal:

• Whether the ALJ property evaluated the opinion of Plaintiff's treating physician, Paul Simon, M.D.;

• Whether the ALJ erred by failing to consider Plaintiff's work history in his "credibility assessment"; and

• Whether the ALJ's finding of transferable skills is consistent with Agency policy and supported by substantial evidence.  (J. Mot. at 4.)

/ / /

3

20cv875-MSB

## IV.  STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  Id.; Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).

"Substantial evidence means more than a mere scintilla but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  See Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision.  See Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

## V.  DISCUSSION

**A.      Whether the ALJ Properly Evaluated the Opinion of Plaintiff's Treating Physician, Paul Simon, M.D.**

Plaintiff argues that his treating physician, Dr. Simon, assessed greater limitations than the ALJ in his RFC finding, and the ALJ's analysis of Dr. Simon's opinion is contrary to law and not supported by substantial evidence.  (J. Mot. at 21–23.)  Plaintiff explains that he is not challenging the ALJ's finding that he has the RFC to perform sedentary work; rather, Plaintiff is challenging the ALJ's finding that he can perform sedentary work on a "regular and continuous basis."  (Id. at 21.)  Plaintiff further contends that the

ALJ applied the wrong standard in requiring "entire[]" consistency between Dr. Simon's opinion and the objective medical evidence, and erred by not considering the 20 C.F.R. §404.1527(c) factors in determining how much weight to assign Dr. Simon's opinion. (Id. at 22–23, 36–37.)

The Commissioner contends that the ALJ properly evaluated Dr. Simon's opinion, and there is substantial evidence to support the ALJ's "assessment of the opinion evidence and RFC." (Id. at 31–32.)  The Commissioner asserts the ALJ gave valid reasons for assigning Dr. Simon's opinion little weight.  (Id. at 32–36.)

### 1.  Applicable Law

Three types of physicians may offer opinions in Social Security cases:  (1) those who directly treated the claimant, (2) those who examined but did not treat the claimant, and (3) those who did neither.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  Under the regulations governing claims filed before March 27, 2017, such as here, a treating physician's opinion is generally entitled to more weight than an examining physician's opinion, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's opinion.  Id.; see also Leon D. v. Saul, Case No. 18-CV-02624-LAB-JLB, 2020 WL 6685025, at *1, *6 (S.D. Cal. Nov. 12, 2020), report and recommendation adopted by 2021 WL 110742 (S.D. Cal. Jan. 11, 2021).  This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  See 20 C.F.R. § 404.1527(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  See 20 C.F.R. § 404.1527(c)(2)–(6).

If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons.  See Lester, 81 F.3d at 830; Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).  Where a treating physician's opinion is controverted, it may be rejected only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record.  See Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) ("A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record"); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The ALJ can meet this burden by setting out a "detailed and thorough summary of the facts" and conflicting clinical evidence, stating his interpretation of those facts, and making findings.  Swanson v. Sec'y Health & Human Servs., 763 F.2d 1061, 1065 (9th Cir. 1985); see also Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988) ("The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct. . . . [I]t is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings.").

## 2.  Analysis

Plaintiff's medical records document extensive history of back pain and related medical procedures beginning in the early 1990s.  (See AR.)  Plaintiff was able to cope with the pain until April 2013, when he injured his neck and back, causing a sudden onset of low back pain radiating down his leg.  (Id. at 1120.)  Imaging conducted on May 9, 2013, and February 7, 2014, revealed spinal stenosis.  (Id. at 1090–91, 1219–20.)  Further imaging throughout the years showed degeneration of the lumbar and cervical spine.  (Id. at 520–21, 570, 1252–53.)  Plaintiff was diagnosed with lumbar radiculopathy, (id. at 999), lumbar spondylosis, (id. at 995), lumbar disk displacement, (id.), spinal stenosis in the cervical and lumbar spine, (id. at 540, 1027), sacroiliitis, (id. at 995), myofascial overlay, (id.), status post laminectomy, (id. at 1103), chronic low back pain, (id. at 987, 992), and right knee and neck pain, (id. at 589).

On September 1, 2015, Plaintiff presented to the VA, describing worsening back pain over the previous eight months.  (Id. at 538–43.)  Plaintiff noted that he was "drinking a lot to kill the pain" and was under considerable amount of stress because he was not able to work.  (Id. at 538.)  He was taking Ibuprofen and Hydrocodone to manage the pain.  (Id.)  Plaintiff had full range of motion, with the exception of decreased extension, which was "most painful [with] forward flexion and twisting waist."  (Id. at 539.)  Plaintiff was provided neurosurgery and physical therapy referrals.  (Id. at 540.)

On October 8, 2015, Plaintiff had a physical medicine and rehabilitation consultation, during which he reported that "every joint in my body hurts."  (Id. at 584.)  Plaintiff was not using any assistive devices to walk, but noted having chronic weakness of his left leg after a surgery.  (Id.)  He was scheduled for EMG testing to screen for radiculopathy.  (Id. at 589.)  Plaintiff reported that he was boxing for exercise, but had to quit running due to back pain.  (Id. at 584.)  During his physical examination, Plaintiff had pain with forward flexion and rotation of the back in the middle to low back area.  (Id. at 586.)  He was advised to undergo physical therapy for stability of his core, spine, and hips, to engage in a home exercise program, and to learn proper body mechanics during workouts.  (Id. at 589.)  In addition, Plaintiff was referred to the pain clinic for assessment for spinal injections.  (Id.)

On November 12, 2015, Plaintiff attended a pain management consultation at the VA Pain Management Clinic to address his low back pain.  (Id. at 566–71.)  He reported doing a physical therapy home exercise program "almost every day," which included core, bench, and sitting exercises, "all except high impact stuff," and stated that he stopped running due to pain.  (Id. at 566.)  Plaintiff was scheduled for a caudal epidural steroid injection the following month.  (Id. at 571.)

On January 26, 2016, Plaintiff had a consultation for neck and back pain at the neurosurgery clinic.  (Id. at 559–62.)  He was taking Ibuprofen and Vicodin for his pain.  (Id. at 559.)  Plaintiff reported neck pain, right upper extremity weakness, and

7

1  numbness; he was having difficulty writing, shaving, and using utensils.  (<u>Id.</u>)  He was
2  started on Gabapentin.  (<u>Id.</u> at 561.)

3       At a physical medicine and rehabilitation consultation on February 5, 2016,
4  Plaintiff complained of progressive neck pain, right arm weakness, and right-hand
5  numbness.  (<u>Id.</u> at 589–92.)  He was told to follow up with neurosurgery to discuss
6  surgical treatment options.  (<u>Id.</u> at 591.)

7       On March 15, 2016, Plaintiff had an evaluation at the neurosurgery clinic.  (<u>Id.</u> at
8  578–82.)  He described the same neck and arm symptoms, was given an elbow pad,
9  referred to the hand clinic, and was told to call the pain clinic for epidural steroid
10 injections for his neck.  (<u>Id.</u>)  During his April 19, 2016, epidural steroid injection, it was
11 noted that "[Plaintiff] states that he has never complained of pain but only occasionally
12 in a sporadic lancinating quickly resolving fashion that ESIs are not traditionally helpful
13 for.  He is complaining of numbness in his right C6 distribution of fingers that is
14 somewhat resolving."  (<u>Id.</u> at 797.)

15      On September 15, 2015, MRI of Plaintiff's cervical spine showed moderate
16 multilevel degenerative changes of the cervical spine with disc osteophyte complex at
17 C6-C7 causing moderate bilateral neuroforaminal stenosis.  (<u>Id.</u> at 748–49.)  On the
18 same day, MRI of Plaintiff's lumbar spine showed mild multilevel degenerative changes
19 of the lumbar spine worst at L2-L3, L3-L4, and L5-S1 along with left lateral disc
20 protrusion at L5-S1, which appeared to impinge upon the left S1 nerve root.  (<u>Id.</u> at 744–
21 45.)  MRI of Plaintiff's thoracic spine revealed left paracentral disc protrusion at T7-T8,
22 which indented and deformed the anterior aspects of the spinal cord.  (<u>Id.</u> at 746–47.)

23      On January 26, 2016, an X-ray of Plaintiff's cervical spine showed moderate
24 degenerative disc disease at C6-C7 and mild degenerative disease at C5-C6.  (<u>Id.</u> at 742.)
25 The following month, on February 3, 2016, an MRI of Plaintiff's cervical spine showed
26 stable multilevel degenerative changes of the cervical spine with moderate spinal canal
27 stenosis and moderate bilateral neuroforaminal narrowing at C3-C4 and C5-C6, and
28 severe right with moderate left neuroforaminal narrowing at C6-C7.  (<u>Id.</u> at 740–41.)

20cv875-MSB

1   EMG testing performed on February 26, 2016, showed right ulnar neuropathy at the

2   elbow with axonal features, and chronic right C5 radiculopathy.  (Id. at 624–25.)

3         Plaintiff had numerous epidural steroid injections to treat his pain:  December 8,

4   2015, (id. at 727–29); April 19, 2016, (id. at 797–99); September 29, 2016, (id. at 1010–

5   12); December 5, 2016, (id. at 863–64); April 18, 2017, (id. at 862–63); August 25, 2017,

6   (id. at 861); December 1, 2017, (id. at 958–59); March 2, 2018, (id. at 943–45); and

7   July 10, 2018, (id. at 1274).  During his August 2017 injection appointment, Plaintiff

8   reported that the previous injection gave him significant relief for three-and-a-half

9   months; he reported the same at his December 2017 appointment.  (Id. at 1273.)  At his

10  March 2018 injection appointment, however, Plaintiff stated that his previous injection

11  only gave him moderate relief for two to three weeks; he reported the same at his July

12  2018 appointment.  (Id.)  Subsequently, on September 6, 2018, Plaintiff underwent an

13  orthopedic surgery consultation to discuss surgical options for his pain because his

14  symptoms progressed and were "now affecting his overall quality of life."  (Id. at 1274.)

15        Dr. Simon is Plaintiff's primary care provider at the Veterans Administration San

16  Diego ("VA San Diego") Healthcare System, who has been treating Plaintiff since May

17  2017.[2]  (Id. at 918–25, 949–53, 959–65, 971–78.)  On May 3, 2017, Dr. Simon evaluated

18  Plaintiff and noted "[b]ack pain[,] sees pain clinic, gets LESI's [lumbar epidural steroid

19  injections]."  (Id. at 976–78.)  In June 2018, Dr. Simon refilled Plaintiff's Ibuprofen

20  prescription for his chronic back pain.  (Id. at 920–21.)  Plaintiff asked for a refill because

21  he took the pills when his "back pain flair[ed] up."  (Id. at 921.)  He also informed Dr.

22  Simon that he was still receiving epidural steroid injections every four months.  (Id.)

23

24

25  [2]  Plaintiff's medical records show that he had received treatment for his back at various facilities in
    Palo Alto before moving to San Diego.  (Id. at 411–13.)  In Palo Alto, Plaintiff began receiving physical
26  therapy, was prescribed Ibuprofen for his pain, received epidural steroid injections, and had MRIs and
    X-rays taken of his back.  (Id. at 412–13, 1024.)  Plaintiff subsequently moved to San Diego and became
27  a patient with VA San Diego, where his primary care physician (who treated Plaintiff before Dr. Simon)
    also treated Plaintiff's back pain.  (Id. at 1024–28.)

28

On July 18, 2018, Dr. Simon completed a Treating Source Statement for Plaintiff's physical conditions.  (Id. at 1079–82.)  Dr. Simon reported treating Plaintiff for chronic low back pain and obstructive sleep apnea.  (Id. at 1079.)  He opined that Plaintiff's chronic symptoms were severe enough to interfere with the attention and concentration needed to perform even simple work-related tasks for over 25% of a typical workday.  (Id.)  Dr. Simon also reported that Plaintiff could maintain attention and concentration for less than an hour before requiring a break due to his pain.  (Id.)  Assuming Plaintiff was going to work full-time, Dr. Simon opined that, on average, Plaintiff would likely be absent for four or more days per month.  (Id.)

In assessing Plaintiff's physical limitations, Dr. Simon concluded that Plaintiff could occasionally lift and carry less than 10 pounds; rarely lift and carry 10 pounds; and never lift and carry 20 or more pounds.[3]  (Id. at 1080.)  He also reported that Plaintiff could sit for a total of 7 hours in an 8-hour workday and would require the option to sit/stand at-will.  (Id.)  Dr. Simon noted Plaintiff's degenerative lumbar and cervical spine joint disease.  (Id.)  He further opined that, occasionally, Plaintiff required the use of a cane to ambulate effectively, and cited Plaintiff's documented degenerative disk and joint changes of lumbar, thoracic, and cervical spine in support of this assessment.  (Id. at 1080–81.)  Further, Dr. Simon reported that Plaintiff could rarely use his arms and hands for reaching, handling, fingering, feeling, pushing/pulling, and rarely use foot controls.  (Id. at 1081.)  He also stated that Plaintiff could occasionally climb stairs and ramps, and rarely climb ladders and scaffolds, balance, stoop, kneel, crouch, crawl, and rotate head and neck.  (Id. at 1082.)  Dr. Simon opined that Plaintiff could never operate a vehicle or work around the following:  unprotected heights, moving mechanical parts,

---

[3] "Never" is defined as "not even once in an 8-hour workday"; "rarely" is defined as from 1% to 5% of an 8-hour workday; "occasionally" is defined as from 6% to 33% of an 8-hour workday; "frequently" is defined as from 34% to 66% of an 8-hour workday; "continuously" is defined as from 67% to 100% of an 8-hour workday.  (AR at 1079.)

1   humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme cold or heat,

2   and vibrations.  (Id.)

3        Dr. Simon's opinion was contradicted by three non-treating physicians:

4   orthopedic consultative examiner, Dr. Sabourin, and State Agency medical consultants,

5   Dr. Sin and Dr. Naiman.  (AR at 293–96, 305–09, 755–60.)  Therefore, the ALJ was

6   required to articulate "specific and legitimate reasons" supported by substantial

7   evidence in the record for not crediting Dr. Simon's opinion.  See Turner v. Comm'r Soc.

8   Sec., 613 F.3d 1217, 1222 (9th Cir. 2010) (citing Lester, 81 F.3d at 830–31).

9        Dr. Sabourin conducted an orthopedic examination of Plaintiff on February 3,

10  2017.  (AR at 755–60.)  He opined that Plaintiff was limited to lifting or carrying 20

11  pounds occasionally and 10 pounds frequently, standing and walking up to 6 hours of an

12  eight-hour workday, sitting for 6 hours of an eight-hour workday, and climbing,

13  stooping, kneeling, and crouching occasionally.  (Id. at 760.)  He also stated that Plaintiff

14  "has no significant manipulative limitations at this time.  He is not using assistive devices

15  to ambulate."  (Id.)  In assigning Dr. Sabourin's opinion "substantial" weight, the ALJ

16  reasoned, that the opinion "was based on an actual examination of the claimant, and it

17  is consistent with the evidence of record. . . . For example, this opinion is consistent with

18  previous examinations performed on the client (3F/36, 75; 8F/154)."  (Id. at 23.)

19       The ALJ similarly assigned "substantial" weight to the opinions of State Agency

20  medical consultants, Dr. Sin (assessment dated February 27, 2017) and Dr. Naiman

21  (assessment dated July 12, 2017), who opined that Plaintiff could perform work at the

22  light level with additional limitations.  (Id. at 23–24, 294–96, 307–09.)  The ALJ reasoned

23  that the opinions were "supported by the consistency with the record as a whole

24  including physical examinations performed by the claimant's treating doctors, as well as

25  the consultative examiner (3F/36, 75; 8F/154; 5F).  (Id. at 24.)

26       The ALJ assigned "little" weight to Dr. Simon's more restrictive opinion of

27  Plaintiff's limitations, reasoning as follows:

28

20cv875-MSB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

The undersigned gives little weight to the opinion of Paul Simon, M.D., the claimants['] treating physician for approximately a year and a half (9F). Dr. Simon opined the claimant could lift/carry less than ten pounds occasionally ten pounds rarely; he could sit for 7 hours a day and stand/walk for 2; he requires a sit/stand option; should rarely perform posturals; could occasionally climb stairs and ramps; could never work around unprotected heights, moving mechanical parts, humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme temperatures, vibrations, or operate a vehicle. He also opined the claimant needs a cane to ambulate effectively. He should rarely reach (including overhead), handle, finger, feel and push/pull with either arm or hand, and rarely use foot controls. Dr. Simon's opinion is not entirely consistent with the objective medical evidence, which document[s] the claimant's gait as non-antalgic, and that he could toe and heel walk with no difficulty. (3F/36, 75; 8F/154). His stride was described as brisk with a normal stride (3F/76). The record[s] also show that the claimant reported he had no problem walking and did not use the cane (2F/70). The claimant testified he does exercises at home, and he told his doctor he can do bench and sitting exercises (See Testimony; 3F/54). Additionally, the claimant can travel internationally, and participate in regular physical activity, as noted in the medical record (2F/25, 52, 71; 8F/42-43, 46, 99, 148, 185).

16

(Id.)

17
18
19
20
21
22

     "It is well established that the district court may not resolve a social security case de novo and reach its own conclusions from the evidence." Guttilla v. Astrue, Civil No. 09cv2259 MMA(RBB), 2010 WL 5313318, at *13 (S.D. Cal. Aug. 13, 2010) (citing Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984)). The Court limits its inquiry to the reasons the ALJ stated in his decision. See id. The Court will therefore address the ALJ's stated reasons for discounting the opinion of Plaintiff's treating physician, Dr. Paul Simon, M.D.

23
24
25
26
27
28

     First, the ALJ cited the inconsistency between Dr. Simon's opinion that Plaintiff needs a cane to ambulate and evidence in the medical record showing Plaintiff did not have difficulty walking and did not use assistive devices. (AR at 24.) Plaintiff contends that because the ALJ found that he was limited to sedentary work, the above alleged inconsistency is "irrelevant to evaluating the disabling aspects of Dr. Simon's opinion, which . . . do not relate so much to physical capacity as to Plaintiff's ability to sustain

20cv875-MSB

1   work activity on a regular and continuous basis."  (J. Mot. at 27.)  As Plaintiff correctly

2   points out, the ALJ found that Plaintiff was limited to sedentary work, which is primarily

3   stationary and requires only occasional standing or walking.  (Id. at 20); see also 20

4   C.F.R. § 404.1567(a).  Further, although Dr. Simon's opinion is inconsistent with the

5   records the ALJ cited, those records predated Dr. Simon's opinion by one to three years.

6   (Id. at 24, 584, 710–11, 993.)  Plaintiff's medical records evidence a history of back

7   injuries that necessitated surgeries and treatment of pain with steroidal injections.

8   Plaintiff's epidural steroid injections became progressively less effective, and his back

9   pain became progressively more intense.  (Id. at 1274; see also is at 544 (2/10 pain in

10  March 2016); id. at 652 (7-8/10 pain in September 2016), id. at 990 (6/10 pain after

11  injections in February 2017, with increasing pain in Plaintiff's left lower back over

12  sacroiliac joint, lateral hip, and buttock that worsened when moving from sitting to

13  standing), id. at 1271 (7/10 pain in September 2018).)  As such, Dr. Simon's opinion that

14  Plaintiff "occasionally" required a cane to ambulate was likely a result of his familiarity

15  with the degenerative nature of Plaintiff's condition and his most recent examinations

16  of Plaintiff.

17         The ALJ also cited Plaintiff's ability to exercise at home, participate in regular

18  physical activity, and travel internationally, as evidence of inconsistency between Dr.

19  Simon's opinion and the objective medical evidence.  (AR at 24.)  Inconsistency between

20  a treating physician's opinion and a plaintiff's daily activities is a specific and legitimate

21  reason to discount the treating physician's opinion.  Ghanim v. Colvin, 763 F.3d 1154,

22  1162 (9th Cir. 2014).  In this case, however, the ALJ failed to note that regular exercise at

23  home was an integral part of Plaintiff's physical therapy treatment for his chronic back

24  pain.  (AR at 245–46, 689); see also 20 C.F.R. § 404.1572 ("Generally, we do not consider

25  activities like taking care of yourself, household tasks, hobbies, therapy, school

26  attendance, club activities, or social programs to be substantial gainful activity.");

27  Trevizo v. Berryhill, 871 F.3d 664, 676 (9th Cir. 2017) (The ALJ must develop the record

28  to demonstrate how the daily activities are inconsistent with the physician's opinion).

1    As for Plaintiff's international travel, Plaintiff testified during his administrative

2  hearing that he sat by the aisle when he flew to Thailand, so that he could get up and

3  stretch.  (AR at 252.)  Plaintiff's ability to tolerate an occasional international flight,

4  where he has the option to move around, is not indicative of his ability to perform

5  sedentary work on a regular and continuous basis in a work environment.  (Id. at 24,

6  885); see also Reddick, 157 F.3d at 722 ("[D]isability claimants should not be penalized

7  for attempting to lead normal lives in the face of their limitations); Fair v. Bowen, 885

8  F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to . . .

9  the more grueling environment of the workplace, where it might be impossible to

10  periodically rest or take medication."); Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir.

11  1987) (a disability claimant need not "vegetate in a dark room excluded from all forms

12  of human and social activity" to be deemed eligible for benefits).

13    Further, the opinions of the three non-treating physicians, which the ALJ assigned

14  substantial weight, predated Dr. Simon's opinion by more than a year.  Dr. Sabourin's

15  examination of Plaintiff was in February 2017, (AR at 755–60), the initial review by State

16  Agency medical consultant Dr. Sin was also in February 2017, (id. at 293–96), and the

17  reconsideration by State Agency medical consultant Dr. Naiman was in July 2017, (id. at

18  305–09).  Plaintiff's treating physician, Dr. Simon, issued his opinion in July 2018, and

19  therefore, his opinion was the most current medical opinion addressing Plaintiff's

20  physical limitations.  (Id. at 1079–82.)  "Where a claimant's condition is progressively

21  deteriorating, the most recent medical report is the most probative."  Young v. Heckler,

22  803 F.2d 963, 968 (9th Cir. 1986) (citing Stone v. Heckler, 761 F.2d 530, 532 (9th Cir.

23  1985)); see also Haulot v. Astrue, 290 F. App'x 53, 54 (9th Cir. 2008) (quoting

24  Magallanes, 881 F.2d at 755) ("[w]here a claimant's condition becomes progressively

25  worse, medical reports from an early phase of the disease are likely to be less probative

26  than later reports.").  Additionally, the more restrictive limitations set forth in Dr.

27  Simon's opinion are supported by the most recent medical evidence showing that

28  Plaintiff's epidural injections became less effective overtime, as well as marked

1    progression of Plaintiff's degenerative impairments.  (Id. at 1273–74.)  The Court

2    therefore concludes that the ALJ did not provide "specific and legitimate reasons that

3    are supported by substantial evidence in the record" for discounting Dr. Simon's

4    opinion, and finds that the ALJ committed a legal error in doing so.  See Lester, 81 F.3d

5    at 830–31.

6    **B.    Whether the ALJ Erred by Failing to Consider Plaintiff's Work History in his**

7    **Credibility Assessment**

8         Plaintiff argues that the ALJ erred because he did not acknowledge or discuss

9    Plaintiff's "exemplary work record" and military service in his "credibility finding."  (J.

10   Mot. at 40, 45–46.)  The Commissioner maintains that the ALJ properly evaluated

11   Plaintiff's symptom testimony by providing multiple valid reasons in support of his

12   decision, and argues that while the ALJ may consider work history, he is not required to

13   do so.  (Id. at 42–44).

14        **1. Applicable Law**

15        "[B]ecause symptoms, such as pain, are subjective and difficult to quantify," the

16   ALJ considers "all of the evidence presented," including information about the

17   claimant's prior work record, statements about their symptoms, evidence submitted by

18   their medical sources, and observations by the Agency's employees and other persons.

19   20 C.F.R. § 404.1529(c)(3) (emphasis added).  Social Security Ruling ("SSR") 16-3p, which

20   went into effect before the ALJ's decision,[4] rescinded and superseded SSR 96-7 and the

21

22   ──────────────────

     4

23        This SSR, republished in its entirety, includes a revision to clarify that our adjudicators
          will apply SSR 16-3p when we make determinations and decisions on or after March 28,
24        2016.  When a Federal court reviews our final decision in a claim, we also explain that
          we expect the court to review the final decision using the rules that were in effect at the
25        time we issued the decision under review.  If a court remands a claim for further
          proceedings after the applicable date of the ruling (March 28, 2016), we will apply SSR
26        16-3p to the entire period in the decision we make after the court's remand.

27   SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017).

28

1  former "credibility" language.[5]  The Ninth Circuit, however, found the SSR 16-3p

2  changes to be "largely stylistic" and that the new ruling "makes clear what [Ninth

3  Circuit] precedent already required:  that assessments of an individual's testimony by an

4  ALJ are designed to "evaluate the intensity and persistence of symptoms . . . and not to

5  delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness."

6  Trevizo, 871 F.3d at 679 n.5; Marina M. v. Berryhill, Case No. ED CV-17-02374 AFM, 2018

7  WL 5858400, at *4 n.2 (C.D. Cal. Nov. 6, 2018).

8      **2. Analysis**

9      The ALJ stated in his written decision that in making his credibility finding, he

10  considered "all symptoms and the extent to which these symptoms can reasonably be

11  accepted as consistent with the objective medical evidence and other evidence, based

12  on the requirements of 20 CFR 404.1529 and SSR 16-3p."  (AR at 20.)  "[A] full-blown

13  written analysis of all the regulatory factors" by the ALJ is not required.  Hoffman v.

14  Berryhill, Case No.: 16-cv-1976-JM-AGS, 2017 WL 3641881, at *4 (S.D. Cal. Aug. 24,

15  2017).  "[T]he regulations and rulings contain no requirement that each and every factor

16  be specifically analyzed in an ALJ's decision."  Yantos v. Berryhill, Case No.: 15cv02733

17  JAH-BGS, 2018 WL 899126, at *6 (S.D. Cal. Feb. 14, 2018) (citing 20 C.F.R. § 404.1527(c)

18  and SSR 96-2p)  The ALJ specifically stated in his decision that he considered factors

19  listed in 20 C.F.R. § 404.1529 and specified reasons for his credibility determination, (see

20  AR at 20, 22); as such, the ALJ was not required to specifically analyze Plaintiff's work

21  history.  See Yantos, 2018 WL 899126, at *6; see also Soto v. Berryhill, Case No.: 3:17-cv-

22  1584-BEN (RNB), 2018 WL 4599758, at *6 (S.D. Cal. Sept. 25, 2018) (emphasis added)

23  (while "the ALJ is required to consider a claimant's work history when assessing

24  credibility, see 20 C.F.R. § 404.1529(c)(3)," the ALJ is not required to "specifically

25  mention a claimant's 'strong work history' in his/her assessment of the claimant's

26

27  [5] "We are rescinding SSR 96-7p . . . and replacing it with this Ruling . . . we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term."  SSR 16-
28  3p, 2017 WL 5180304, at *2.

1  credibility.").  Accordingly, the ALJ did not commit legal error by not specifically

2  discussing Plaintiff's work history in his credibility finding.

3  **C.    Whether the ALJ's Finding of Transferable Skills is Consistent with Agency Policy**

4  **and Supported by Substantial Evidence**

5          Plaintiff argues that the ALJ erred when he found that even though Plaintiff could

6  not perform his past jobs, Plaintiff could perform other jobs utilizing the skills he had

7  obtained while performing those jobs.  (J. Mot. at 4.)  Specifically, Plaintiff contends that

8  the ALJ failed to address and properly apply the "special rules for transferability" for

9  advanced age claimants.  (Id. at 5–6.)  Plaintiff asserts that the VE did not testify that

10  Plaintiff's skills would transfer with "very little, if any, vocational adjustment," the ALJ's

11  statement in his written decision that the VE testified regarding the special rules of

12  transferability is not accurate, and the VE offered unclear and confusing testimony

13  regarding the transferable skills issue.  (Id. at 7–12.)  Plaintiff maintains that the ALJ

14  erred at step five of the sequential evaluation process, and the error was not harmless.

15  (Id. at 4–6, 11–12.)

16          The Commissioner claims that the ALJ properly relied on VE testimony that

17  Plaintiff had acquired specific skills from his past work that would transfer to other work

18  available in the national economy.  (Id. at 12–14.)  The Commissioner contends that the

19  VE is the recognized expert, and the VE's testimony was substantial evidence supporting

20  the ALJ's step five findings.  (Id. at 12–15.)

21      **1.  Applicable law**

22          At step five of the sequential evaluation process, the ALJ is required to determine

23  whether a claimant can perform any other work existing in significant numbers in the

24  national economy, given the claimant's RFC, age, education, and work experience.  See

25  20 C.F.R. § 404.1520(g); see also Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1222

26  (9th Cir. 2009) (citing Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999) ("The burden

27  of proof is on the claimant at steps one through four, but shifts to the Commissioner at

28  step five.").  In determining whether a claimant can perform other work, the ALJ must

17

1  find that the claimant has "[s]kills that can be used in other work (transferability)."  20

2  C.F.R. § 404.1568(d).  A claimant's skills will be considered transferable "when the

3  skilled or semi-skilled work activities [the claimant] did in the past work can be used to

4  meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of

5  work."  20 C.F.R. § 404.1568(d)(1).

6       The Social Security regulations recognize that older individuals face greater

7  challenges in adapting to other work; therefore, there are "special rules for persons of

8  advanced age."  20 C.F.R. § 404.1563(e); see also Rose v. Berryhill, Case No. CV 17-

9  03940-DFM, 2018 WL 5262580, at *2 (C.D. Cal. Oct. 19, 2018).  When a claimant is of

10  advanced age (age fifty-five or older) and has a severe impairment that limits the

11  claimant to no more than sedentary work, the Social Security Regulations provide a

12  heightened standard for transferability of skills.  20 C.F.R. § 404.1568(d)(4).  To meet the

13  step five burden of proof, the ALJ must either find that "very little, if any, vocational

14  adjustment in terms of tools, work processes, work settings, or the industry" would be

15  required, or "otherwise acknowledge that a more stringent test is being applied which

16  takes into consideration the claimant's age."  Id.; Renner v. Heckler, 786 F.2d 1421,

17  1423–24 (9th Cir. 1986).  The ALJ may consult with a VE to "ascertain whether a given

18  skill or set of skills are transferable in a claimant's particular case."  Bray, 554 F.3d at

19  1225 (internal quotations omitted).  However, "[i]t is the ALJ, and not the VE, who is

20  responsible for the findings," and such findings must be supported by the record.  See

21  id.; Coletta v. Massanari, 163 F. Supp. 2d 1101, 1106 (N.D. Cal. 2001).

22       **2.  Analysis**

23       Plaintiff was fifty-six years old on the date of the administrative hearing, and thus

24  he was a claimant of advanced age for purposes of determining his entitlement to social

25  security disability benefits.  See 20 C.F.R. § 404.1568(d)(4); (see also AR at 20, 230.)  The

26  ALJ found that Plaintiff had past relevant work as a helicopter pilot (DOT 196.263-038),

27  commercial airplane pilot (DOT 196.263-014), chief pilot (DOT 196.167-101), pilot

28

1 | instructor (DOT 196.223-014), and supervising airplane pilot (DOT 196.163-014).  (AR at
2 | 25.)

3 | At the hearing, the ALJ asked the VE what skills Plaintiff previously acquired that
4 | would enable him to "do other work besides flying in the civilian economy."  (Id. at 262.)
5 | The VE testified that based on rank, experience, and supervision levels, Plaintiff had
6 | acquired the following skills:  coordinating, organizing, scheduling, personnel
7 | supervising, reviewing, administering personnel reviews, instructing, interpreting,
8 | developing and implementing regulations or policies, assessing performance, thorough
9 | knowledge of transportation measures, as well as "the fuel and metric that goes with
10 | transportation and instructing," developing lesson plans, and coordinating instruction
11 | services.  (Id.)  The VE opined that an individual with such skills could perform the
12 | following jobs:  travel clerk (DOT 238.167-010, approximately 90,000 jobs), office
13 | manager (DOT 188.167-058, approximately 125,000 jobs), and transportation dispatcher
14 | (DOT 912.167-010, approximately 15,000 jobs).  (Id. at 262–63.)  The ALJ determined
15 | that the VE's testimony was consistent with the information contained in the DOT, and
16 | concluded that Plaintiff had acquired work skills from past relevant work that were
17 | transferable to other occupations with jobs existing in significant numbers in the
18 | national economy.  (Id. at 25–26.)  The ALJ ultimately found that Plaintiff could perform
19 | the jobs of travel clerk (DOT 238.167-101), office manager (DOT 188.167-058), and air
20 | transportation dispatcher (DOT 912.167-010).  (Id. at 26.)

21 | The ALJ questioned the VE as follows:  "[Y]ou're the expert, do you believe . . .
22 | that the jobs you've just given me in the civilian sector . . . [do you] believe that with,
23 | with reasonable adjustment he could perform those jobs given his experience in the Air
24 | Force?"  (Id. at 263.)  The VE replied, "[y]es, Your Honor."  (Id.)  The ALJ the asked,
25 | "[a]nd it's your opinion that he would be able to do these, pick up and do these jobs
26 | with the training they gave him when he shows up?"  (Id. at 264.)  The VE replied, "[y]es,
27 | sir, and likely transfers to civil service and federal employment."  (Id.)  The ALJ followed
28 | up by asking, "the jobs you've given me . . . there are positions within the government

that are these," to which the VE replied, "[y]es, sir."  (Id.)  The ALJ then inquired if

Veteran's preference would be given for the identified jobs, and the VE replied, "[y]es,

sir.  There may well be Veterans who would also, and through that search, could also

look into other [sic] where the government will take in and train individuals, they go into

contract administration acquisitions.  Other categories that are associated with air

support."  (Id.)

The ALJ also asked about the training requirements for the identified positions:

"[b]ut some of these jobs would require training[,] but the three you've given me don't

require much training under the, what the employer would give you the first month or

so on the job?"  (Id.)  The VE answered, "[w]ell the ones that I gave you would require

certainly an orientation to the civilian side of services and procedures.  So there would

be orientation and training time."  (Id. at 265.)

The ALJ then asked:

> And in your experience does a person with the claimant's profile[,]
> assuming he's otherwise physically and mentally capable of such work[],
> would that person be a good candidate for the jobs you've discussed if
> there were openings given the background of the individual, not talking
> about anything else, just the background?

(Id.)  The VE responded that such person would be a "competitive applicant."  (Id.)

In light of Plaintiff's advanced age, the ALJ was required to consider the degree of

vocational adjustment required to transfer the skills Plaintiff acquired during his past

jobs to each of the three positions identified by the VE.  See Renner, 786 F.2d at 1424.

The ALJ questioned the VE to determine whether Plaintiff possessed transferable skills;

however, it is not clear from the record that the ALJ considered the amount of

vocational adjustment required to utilize those skills in a new job.  (See AR at 25.)

Although the ALJ asked the VE if the new jobs could be performed with "reasonable

adjustment," (id. at 263), the inquiry was insufficient in light of Plaintiff's advanced age.

See Renner, 786 F.2d at 1424 ("[I]t is necessary to assure that the correct legal standard

was applied"; where a claimant is of advanced age "[t]he ALJ must either make a finding

1  of 'very little vocational adjustment' or otherwise acknowledge that a more stringent

2  test is being applied which takes into consideration [the claimant's] age.").

3       The ALJ's further questioning of the VE did not clarify the degree of the vocational

4  adjustment required for the identified jobs.  The ALJ's question of whether the

5  identified jobs could be performed with the training received after "show[ing] up" was

6  general and imprecise, and failed to illicit an answer that clearly demonstrated that very

7  little, if any, adjustment would be necessary.  (See AR at 264.)  Further, when the ALJ

8  inquired whether the extent of the training was limited to what the employer would

9  "give the first month or so," the VE did not give a clear answer and replied that both

10  orientation to the civilian side of services and training would be required for these jobs.

11  (Id. at 265.)  The ALJ failed to further clarify the amount of time that would be required

12  for orientation and training; instead, the ALJ focused on candidacy for the new jobs.

13  However, an individual can be an excellent candidate, but need to complete many

14  trainings and acquire numerous additional skills to be able to adapt and perform the

15  new job proficiently.

16       Notably, during Plaintiff's attorney's examination of the VE, the attorney asked,

17  regarding the office manager position, whether skills from a military position would be

18  "easily transferable" to the civilian service.  (Id. at 275.)  The VE responded "it's

19  transferable, there would be orientation," and also added that "easily is a term that I

20  can't work with."  (Id.)  Upon further questioning by the attorney, the VE testified that

21  orientation for the office manager and travel clerk positions would take ninety days, and

22  orientation for transportation dispatcher position would take three to six months,

23  depending on facilities.  (Id. at 276.)

24       The VE's testimony that there would be "reasonable adjustment" and

25  "orientation and training time" in the identified jobs, that the length of the required

26  orientations would range from ninety days to six months, and the VE's overall

27  testimony, did not amount to a specific showing that Plaintiff would have to make very

28  little if any vocational adjustment to work in the three positions the VE had identified.

1  See Terry v. Sullivan, 903 F.2d 1273, 1279 (1990) (citing SSR 82-41) ("In order to

2  establish transferability of skills for such [advanced age] individuals, the semiskilled or

3  skilled job duties of their past work must be so closely related to other jobs which they

4  can perform that they could be expected to perform these other identified jobs at a high

5  degree of proficiency with minimal amount of job orientation.").  Accordingly, the ALJ's

6  statement in his decision that "[t]he vocational expert testified the claimant's previous

7  work and skillset is so congruent with the jobs recited above that the claimant would

8  not need to make significant vocational adjustment (beyond initial orientation, and

9  training provided to new hires)," is unsupported by the record.  (AR at 26–27.)

10        The Court finds that the ALJ erred by failing to make a specific finding that very

11  little, if any, vocational adjustment was required to transfer Plaintiff's skills to the new

12  jobs or otherwise acknowledge that a more stringent test was being applied, which took

13  into consideration Plaintiff's advanced age, and the ALJ's error was not harmless.  See

14  Renner, 786 F.2d at 1423–24; see also Coletta, 163 F. Supp. 2d at 1105, 1106-07 (finding

15  that remand was warranted, where the claimant was of advanced age (fifty-seven) and

16  the ALJ failed to make a specific finding that very little vocational adjustment was

17  required to transfer the claimant's skills as construction foreman to dispatcher clerk

18  position, or to acknowledge that more stringent test was being applied).  Because the

19  ALJ failed to make the requisite findings, the ALJ did not meet his burden at step five to

20  establish that Plaintiff can make an adjustment to other work.

21                                    **VI.  CONCLUSION**

22        The reviewing court may enter a "judgment affirming, modifying, or reversing"

23  the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand

24  the case to the Social Security Administration for further proceedings.  Id.  The reviewing

25  court has discretion to decide whether to remand for further proceedings or award

26  benefits.  See Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); McAllister v. Sullivan,

27  888 F.2d 599, 603 (9th Cir. 1989).  Remand for further proceedings is warranted where

28  additional administrative proceedings could remedy defects in the decision.  See Kail v.

1 | <u>Heckler</u>, 722 F.2d 1496, 1497 (9th Cir. 1984).  Remand for the payment of benefits is

2 | appropriate where no useful purpose would be served by further administrative

3 | proceedings, where the record has been fully developed, or where remand would

4 | unnecessarily delay the receipt of benefits to which the disabled plaintiff is entitled.  <u>See</u>

5 | <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986); <u>Bilby v. Schweiker</u>, 762 F.2d

6 | 716, 719 (9th Cir. 1985).

7 |     In this case, Plaintiff contends that the Court "should enter judgment under

8 | sentence four of 42 U.S.C. § 405(g), reversing the Commissioner's final decision with a

9 | remand for a rehearing, i.e., for further administrative proceedings."  (J. Mot. at 46.)

10 | The Commissioner maintains that the appropriate remedy in the event of reversal

11 | would be a remand for further administrative proceedings.  (<u>Id.</u>)  The Court has

12 | concluded that remand for further proceedings is warranted because additional

13 | administrative proceedings could remedy the defects in the ALJ's decision.

14 |     For the reasons set forth above, the Court **ORDERS** that judgment be entered

15 | reversing the decision of the Commissioner and remanding this matter for further

16 | administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

17 |     **IT IS SO ORDERED.**

18 | Dated:  September 3, 2021

Honorable Michael S. Berg
United States Magistrate Judge

20cv875-MSB